

**IT IS ORDERED as set forth below:**

**Date: February 12, 2021**

_____
**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 19-64014-BEM |
| WMC KIM HOLDINGS, LLC, | |
| Debtor. | CHAPTER 11 |

### O R D E R

A hearing was held on January 14, 2021 on Debtor's Motion to Disallow Claim and Objection to Claim of C1, LLC (the "Objection") [Doc. 86] and the Verified Creditors' Response to Debtor's Motion to Disallow Claim & Objection to Claim (the "Response") [Doc. 92] at which the Court heard testimony from Ivan Kim ("Mr. Kim")[1] and See Wook "Arthur" Chung ("Mr. Chung") and Respondent's Exhibits 1-6, 7A, 7B, 8, 8A, 9 and 9A were admitted by stipulation into evidence. [Docs. 96, 115]. After careful review of the evidence, the briefs of the parties and the post hearing briefs, the Court now enters its findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052.

---

[1] Mr. Kim testified with the assistance of a Korean to English interpreter.

**I.    Facts**

Mr. Kim is a member of WMC Kim Holdings, LLC ("Debtor"). Mr. Kim was born in Korea and first came to the United States in 1977. Prior to 2016, Mr. Kim operated several different businesses, including a restaurant, that were apparently successful. Mr. Kim moved to the Atlanta area in 2012. At that time, Mr. Kim met and became a client of Mr. Chung, who is a certified public accountant. Mr. Chung provided accounting services, including preparing financial statements, tax returns and sales and payroll taxes, for Mr. Kim's restaurant. Mr. Chung's main contact was Mrs. Kim who did the day-to-day accounting work for the Kims' businesses. Mr. Chung operated his business through C1, LLC ("C1" or "Respondent") during the period relevant hereto. Mr. Chung subsequently has operated through a different entity, but C1 remains an active corporation.

Debtor was formed in October 2016. At that time, Mr. Kim owned a restaurant through a corporation other than Debtor but wished to exit the restaurant business and enter a business that was less labor intensive and had more flexible hours. Mr. Chung testified that Mr. Kim asked him for advice about what business he should go into to meet those needs. Mr. Chung had a client, Joshua Song, who was involved in obtaining loans for car wash businesses, so Mr. Chung suggested the car wash business to Mr. Kim.

Mr. Kim testified that Mr. Chung introduced him to Mr. Song, whom Mr. Kim described as a consultant, and that was how Mr. Kim started Debtor's business. Mr. Chung testified that the introduction took place in 2016. Mr. Song assisted Mr. Kim in acquiring a loan to purchase a car wash property, and Mr. Chung provided $100,000 towards the purchase. The parties dispute whether Mr. Chung's funds were a loan or an investment in Debtor.

2

The parties agree that Mr. Chung wrote a check payable to Debtor for $100,000 from C1's account that was dated February 22, 2017 [Doc. 96 pp. 5-6] and was deposited by Mr. Chung into Debtor's account. The parties also agree that Mr. Chung signed the Operating Agreement of WMC Kim Holdings, LLC (the "OA"), which stated Mr. Chung had a 10% interest in Debtor and had made a capital contribution of $100. The OA states that it was "made and entered into this 27th day of October 2016 by Ivan Kim and Peter W. McKanna, See Wook Chung," but further states that it was executed on March 2, 2017. [Doc. 96 p. 29, 34]. The parties agree that the OA was provided to the bank in connection with the car wash loan, which closed on March 17, 2017. The parties agree that Debtor's tax returns for 2017, 2018, and 2019 show Mr. Kim as the 100% owner of Debtor. [Doc. 96 pp. 9, 12, 15].

Mr. Kim testified that Mr. Chung was a 10% owner of the Debtor because he signed the OA. Mr. Kim further testified that Mr. Chung is a CPA, that he and Mr. Chung talked about the OA, and that Mr. Chung and Mr. Song understood it very well. Mr. Kim testified that after Mr. Chung signed the OA, Mr. Song and Mr. Chung showed it to him.

The OA identifies the members in Exhibit A as Mr. Kim with an 80% interest and Mr. McKanna and Mr. Chung, each with a 10% interest. Exhibit B to the OA identifies Mr. Kim as the manager, and Exhibit C lists the members' initial capital contributions, including a $100 contribution by Mr. Chung. [Doc. 96, pp. 35-37]. Mr. Kim further testified that the OA was accurate. The OA indicates it was entered on October 27, 2016 and executed on March 2, 2017, but an email indicates Mr. Chung signed the OA using an electronic signature program on March 3, 2017. [Doc. 115, pp. 8-10]. Section 8.1 of the OA provides for Members Agreements that may supersede conflicting provisions in the OA, and Section 3.1 provides that profits and losses will be allocated proportionately to members based on their equity stake in the absence of a Members

3

Agreement providing otherwise. [Doc. 96, pp. 30, 34]. The record does not reflect that there were any Member Agreements at the times relevant hereto. Mr. Kim testified that his understanding was that profits and losses would be shared according to the shares owned by each member.

      Mr. Kim initially testified that there were no operating agreements for Debtor other than the OA. He then acknowledged that an earlier operating agreement showed him as the sole owner of Debtor and was signed by him in the later part of 2016.[2] Mr. Kim said that at that time there were no investors, but that four months later, when Mr. McKanna and Mr. Chung said they wanted to invest, new papers were prepared. Mr. Kim testified that Mr. Chung said he wanted to invest because Mr. Kim was doing an excellent job operating his other businesses. Mr. Kim acknowledged that the OA does not indicate that it is an amendment to a prior operating agreement or make any reference to the 2016 operating agreement. In explanation, Mr. Kim testified that Mr. Song and Mr. Chung "made these paperworks" and they "are the one who understand completely, they know about these paperworks better than I do." [Tr. at 12:08:54-12:09:10].

      In contrast to the ownership interests listed in the OA, Mr. Kim was shown as the 100% owner of Debtor in Debtor's tax returns filed in 2017, 2018 and 2019. [Doc. 96, pp. 8-15]. Mr. Kim testified that this was the result of Mr. McKanna returning his shares and Mr. Chung stating that he did not want to be involved in the business and leaving as well. Mr. Chung prepared the 2017 tax return and Schedule K-1 showing Mr. Kim as the sole owner of the Debtor. Mr. Kim testified that he did not see the percentage ownership on the tax return before it was filed. However, Mr. Chung testified that he sent the documents to Mrs. Kim's email address with a request for his clients to review it. No one objected to the contents, so the documents were filed. He further testified that he understood that there were no other shareholders of the Debtor and that he did not

---

[2] Mr. Kim testified to different dates for the original operating agreement, including June 2016, August 2016, and October 27, 2016. This agreement is not part of the record established at the Hearing.

4

consider himself an owner of the company. The 2018 and 2019 tax returns were prepared by someone other than Mr. Chung at a different accounting firm. Mr. Kim testified that Mr. Ken Kim is now a 10% owner of Debtor.[3]

The purchase of the car wash property closed on March 17, 2017. Mr. Kim and Mr. Chung testified that the OA was used for closing the purchase. The OA was sent to Mr. Chung via email by Mr. Song on March 3, 2017. The transmittal email states, "Please sign this form for our closing. This is only for bank purpose and there will be another one to be signed by all partners for our own purpose." [Doc. 115, p. 9]. Mr. Chung testified that he received the email from Mr. Song, that the document showed he had a 10% interest in the company and that the document showed he had contributed $100. He stated he was not familiar with these numbers but the email said the document was needed for closing so he signed it electronically. Mr. Chung testified that prior to receiving the email, he had never had any discussions with anyone about being an investor in Debtor. Mr. Chung also signed a resolution of the Debtor authorizing the company to obtain the loan to buy the car wash property. Mr. Chung received an email from Mr. Song dated March 13, 2017 with the subject line "Please DocuSign: LLC Resolution (purchase & loan).pdf". [Doc. 96, p. 27]. The resolution is dated March 17, 2017. [Doc. 116, p. 6]. Mr. Chung testified that he did not hesitate to sign the resolution because he understood from the email about the OA that this was for loan purposes.

Mr. Chung testified that both Mr. Kim and Mr. Song asked him to borrow money to fund the shortfall for the car wash closing. Mr. Chung testified that he decided to make the loan out of good will because both individuals were good clients. Mr. Kim testified that he asked Mr.

---

[3] Mr. Chung testified that Mr. Kim told him he had sold Debtor to a Mr. Kenneth Kim, but it was not clear whether the sale was partial or whole. The Court takes judicial notice of Debtor's Statement of Financial Affairs, which lists Mr. Kim as 85% owner, Kang Kim as 10% owner, and Mr. Chung as 5% owner. [Doc. 8, pp. 19-20].

5

Chung for money to start the business, that Mr. Chung agreed and wrote a check to the Debtor in the amount of $100,000 drawn on C1's account, that Mr. Chung deposited the check into Debtor's account, and that Mr. Kim only realized it had been deposited upon checking his account one day. Mr. Chung testified that Mr. Song provided him with Debtor's account number and bank, and that the bank was close to his home so he went to the bank and deposited the check. Exhibit 1 is a copy of a SunTrust Bank statement for account number ending in 2524 in the name of C1 dated February 28, 2017. The statement shows a copy of check number 31445 dated February 22, 2017, drawn on account number ending in 2524, and made payable to WMC Kim Holdings, LLC in the amount of $100,000 (the "Check").  The Check is signed by Mr. Chung, and the memo line is blank. [Doc. 96, pp. 5-6]. Mr. Chung testified that prior to writing and depositing the Check he never had any discussions with anyone about being an investor in Debtor.

Mr. Chung testified that when both Mr. Kim and Mr. Song talked with him about lending the money, each of them said that Mr. Kim would sell his restaurant after closing on the car wash as he would not have time to run both businesses, and that there were several buyers waiting, so it could be sold immediately. Mr. Chung stated that one reason he felt he could make the loan was because he was sure that he would be paid back soon because of the planned sale of the restaurant. Mr. Chung testified that after the car wash closing, Mr. Kim for the first and only time suggested that Mr. Chung should be an investor. Mr. Chung testified that he declined because $100,000 was not comparable to 10% of the value of Debtor, and he was very busy with his accounting practice. Mr. Kim testified that Mr. Chung was never told that he would be paid from the proceeds of the restaurant sale, but that after the restaurant was sold Mr. Chung said he did not want to be involved in the business and asked for his money back.

6

The restaurant was sold in April 2017, and Mr. Kim received $550,000, of which he put $450,000 into the Debtor. He testified he paid other expenses with the remainder of the proceeds. Mr. Kim also put an additional $600,000 into the Debtor. Mr. Chung testified that he was upset when the restaurant was sold and he did not receive payment, so he went to the car wash and demanded payment. Mr. Kim told him the car wash was not making money so he could not pay. Mr. Chung then offered to split the amount owed him with a current $50,000 payment and the second payment later when business improved. Mr. Kim declined. Mr. Kim testified that when Mr. Chung came to the car wash to collect, Mr. Kim told Mr. Chung that Mr. Chung was a shareholder, that there was not enough money to operate, and that Mr. Kim could not pay the money at that time. Mr. Kim testified further that he did tell Mr. Chung he would pay him back if he had money regardless of whether the funds were an investment or not, but he did so because Mr. Chung had requested the money several times, which was distressing to Mr. Kim.

Over the next year and a half, Mr. Chung continued to ask Mrs. Kim about repayment without success. In December 2018, Mr. Chung sent a promissory note that had been prepared by counsel to Mrs. Kim by email. The note was to be payable by Mr. and Mrs. Kim in their individual capacities. [Doc. 96, p. 17]. Mr. Kim testified that Mr. Chung never personally asked him to sign a promissory note individually or on behalf of Debtor, Mr. Chung never showed him a promissory note, and no promissory note was signed. The note was not signed by Mr. or Ms. Kim, and Mr. Chung testified that he eventually filed suit in state court against them.[4] Mr. Chung testified the original defendants in the state court lawsuit did not include Debtor, but the omission of Debtor was an error by his attorney.

---

[4] A copy of the state court complaint was attached to the Objection but was not tendered or admitted as evidence. [Doc. 86, p. 27]. Mr. Chung testified that the attorney who drafted the promissory note on his behalf is representing the Kims in the state court lawsuit.

7

On June 12, 2019, Mr. Kim and Mr. Chung had a conversation on the telephone that Mr. Chung's telephone system recorded. The transcript of that conversation is Exhibit 7B. [Doc. 96, pp. 23-25]. In the conversation, Mr. Kim asks for Mr. Chung's assistance in selling the car wash. Mr. Kim refers to the business as "our business" and in three instances references his individual need to pay Mr. Chung back. Mr. Chung testified that he intended the transaction to be a loan, that it was a loan to Debtor, not to Mr. Kim, and that he did not make false statements to the bank in signing the OA but rather was merely trying to assist his clients in closing the loan. Mr. Chung stated that he did not think much about it when he lent the money to Mr. and Mrs. Kim because he had known them a long time and did not expect them not to pay him back. Additionally, he felt secure because he knew they were going to sell the restaurant such that he did not feel the need for a loan agreement. Mr. Chung also stated that when he saw the OA stated that he was a 10% owner, he thought the interest might provide security if the loan was not repaid.

Debtor filed a Chapter 11 petition on September 3, 2019. C1 filed a proof of claim in the bankruptcy case asserting a general unsecured claim in the amount of $100,000 for "money loaned." [Claim No. 4].

**II.     Analysis**

Debtor objected to C1's proof of claim (the "Claim") asserting that it was incorrect because Debtor's OA lists three initial members including Mr. Chung, that Mr. Chung filed suit in state court against Mr. and Mrs. Kim individually alleging the loan was to Mr. Kim not to Debtor, that there is no promissory note or payments, and that the Claim does not comply with the requirements of Federal Rule of Bankruptcy Procedure 3001(c)(1).

In response C1 asserts that Mr. Kim was the 100% owner of Debtor, that Mr. Kim asked to borrow $100,000 to close the sale of a car wash business and promised to repay C1 in a

8

few months with proceeds from the sale of a restaurant Mr. Kim owned. Mr. Chung asserts further that he declined Mr. Kim's request to be an investor and that there was an oral contract between the parties that is not subject to the statute of frauds because the Claim is based on an actual loan, not a commitment to loan money, intended to be paid within months and thus within one year such that the oral loan contract is enforceable.

### A. The Documentation Objection

The Bankruptcy Code allows for creditors to file proofs of claim while the Federal Rules of Bankruptcy Procedure (the "Rules") provide for the form, content, and attachments to proofs of claim. 11 U.S.C. § 501(a); *Walston v. PYOD, LLC (In re Walston)*, 606 F. App'x 543, 545 (11th Cir. 2015) (citing *Am. Exress Bank, FSB v. Askenaizer (In re Plourde)*, 418 B.R. 495, 503 (B.A.P. 1st Cir. 2009)). "A proof of claim is a written statement setting forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a). "A proof of claim shall be executed by the creditor or the creditor's authorized agent…." *Id.* 3001(b).

The Claim is not part of the evidence admitted at the hearing on the Objection, however the Court can take judicial notice of the fact that a claim (claims register 4), on Official Form 10, was filed by C1, signed by counsel for C1, and states that it is for a loan in the amount of $100,000. A copy of the Check is attached to the Claim.

Rule 3001 requires documentation if the claim is based upon a written agreement or asserts a secured claim. Fed. R. Bankr. P. 3001(c)(1). Here, Respondent asserts an unsecured claim based upon an oral agreement; thus documentation is not required by Rule 3001. Respondent attached a copy of the Check and filled out Official Form 10, which was signed by its attorney.

9

Thus, the proof of claim comports with the Rules and, to the extent Debtor objects to the Claim for failure to comply with Rule 3001 the Court will overrule that objection.[5]

### B. Objection Based Upon the Nature of the Claim

A proof of claim is allowed unless objected to. 11 U.S.C. § 502(a). Debtor objected to the Claim such that the Claim was not automatically allowed. A claim containing all the information required by Rule 3001 is prima facie valid. Fed. R. Bankr. P. 3001(f); *Walston*, 606 F. App'x at 546. Once an objection is filed the burden shifts to the objecting party to overcome the prima facie validity conferred by Rule 3001(f). *Walston*, 505 F. App'x at 546.

Mr. Kim testified that the money advanced was an investment into Debtor and relies upon the OA in support of that position. Mr. Chung testified that the money advanced was a loan to assist in closing the purchase of a car wash business and to help two of his clients. Thus, the evidence supports an oral agreement to advance $100,000 in conjunction with a closing on March 17, 2017. The remaining terms of the parties' agreement are less clear. The general rules of contract construction apply to parol or oral contracts. *Pacific Atl. Lines, Inc. v. Jah*, No. 1:09-CV-0625-SCJ, 2011 WL 13176016, at *3 (N.D. Ga. Sept. 29, 2011) (citing *Jones v. Destiny Indus., Inc.*, 485 S.E.2d 225, 226 (Ga. Ct. App. 1997)). Contract interpretation is generally a question of law. *Knott v. Knott*, 277 Ga. 380, 381, 589 S.E.2d 99, 101 (2003). "The cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3. When the language of the contract is unambiguous, it will be enforced according to its terms. *McKinley v. Coliseum Health Grp., LLC*, 308 Ga. App. 768, 770, 708 S.E.2d 682, 684 (2011). If the contract is ambiguous, the Court will apply rules of construction to resolve the ambiguity. *Id.* If the rules of construction fail to resolve

---

[5] Debtor did not pursue this portion of the Objection at the Hearing.

the ambiguity, then the intent of the parties must be ascertained by the finder of fact. *Id.* "Parol contracts shall include only contracts in words as remembered by witnesses." O.C.G.A. § 13-1-6.

Key to this case is whether the parties intended for the funds provided by Mr. Chung to be a loan or for the purchase of equity. Debtor argues that the Court should analyze the factors identified in *In re Lane*, 742 F.2d 1311 (11th Cir. 1984), in determining that the money advanced was an equity investment. In *Lane*, the Court identified the following factors to consider when facing the question of whether an advance constitutes debt or equity: 1. the names given to the certificates evidencing the indebtedness; 2. the presence or absence of a fixed maturity date; 3. the source of payments; 4. the right to enforce payment of principal and interest; 5. participation in management flowing as a result; 6. the status of the contribution in relation to regular corporate creditors; 7. the intent of the parties; 8. "thin" or adequate capitalization; 9. identity of interest between creditor and stockholder; 10. source of interest payments; 11. the ability of the corporation to obtain loans from outside lending institutions; 12. the extent to which the advance was used to acquire capital assets; and, 13. the failure of the debtor to repay on the due date or to seek a postponement. *Id.* at 1314-15 (citing *Estate of Mixon v. U.S.*, 464 F.2d 394, 402 (5th Cir. 1972)). In considering these factors, the Court is mindful that each case turns on its own facts and that the factors are "'at most helpful factors to be considered[.]'" *Id.* at 1315 (quoting *Georgia Southern and F. Ry. Co. v. Atlantic Coast Line R. Co.*, 373 F.3d 493, 498 (5th Cir. 1967); *see also Mixon*, 464 F.2d at 402 n.12[6] (noting that thirty-eight factors have been used at various times to determine the debt or equity issue in tax cases).

---

[6] In *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit determined that the Fifth Circuit precedent existing on September 30, 1981 would be binding precedent in the Eleventh Circuit.

11

Debtor also cites to *In re Vega*, 503 B.R. 144 (Bankr. M.D. Fla. 2013), and argues that the facts in *Vega* are similar to those presented here. In *Vega*, the plaintiff sought to except certain loans made to debtor from discharge. In its analysis of one of several advances to debtor's various ventures, the court considered the *Lane* factors in concluding the advance was an investment rather than a loan. *Id.* at 151-52. The most important factor there was that the advance was interest free, although the court also noted that: (i) plaintiff had represented that he was an investor in the entity, (ii) plaintiff made the advance to the entity, (iii) plaintiff knew that the source of payment would be profits from the entity or another of debtor's ventures, and (iv) the advance was not documented and its terms were unknown. *Id.* at 152-53. The court noted further that the entity to which the plaintiff alleged he had made the loan was not consistent in his testimony, was inconsistent with his pleadings, and finally, the plaintiff provided false documents to a bank to forestall exercise of the bank's rights against its collateral. *Id.* at 149-50.

In contrast, Respondent asserts that the facts in the *Mixon* are most similar to those here. In *Mixon*, three shareholders of a bank deposited funds to strengthen the bank's balance sheet in accordance with an agreement with the FDIC and the state banking authority. The funds were reflected in the capital section of the bank's balance sheet and did not earn interest, but requests were made by the bank and the shareholders to allow interest payments. Withdrawals, when allowed by the authorities, were not made in accordance with the shareholders' ownership percentage, and the final distribution of the advance to the depositing shareholders did not affect their receipt of dividends. 464 F.2d at 400-01. There was no written agreement between the depositing shareholders and the bank. This lack of documentation did not cause the advance to be considered equity because the deposit was done in accordance with the agreement with the banking authorities. *Id.* at 403. The documentation that did exist provided for withdrawal based on certain

12

well-defined contingencies, all of which were reasonably foreseeable within a short period of time. *Id.* The fact that the funds were paid out of the same account originally deposited in within the specified time furnished "ample evidence of a fixed obligation and a businesslike, arm's length transaction." *Id.*

Certain facts present in these cases are present here, but none of the facts are so similar as to provide much guidance to the Court in consideration of the nature of the Claim obligation. As a result, the Court will consider the *Lane* factors that are relevant as implicated by the facts and circumstances of the transaction between the parties.

The testimony was at odds over several points, so it is helpful to begin with those things upon which Mr. Kim and Mr. Chung agreed. Both agreed that (i) the advance was made pursuant to Mr. Kim's request, (ii) the OA, signed by Mr. Chung, was used for closing the purchase of the car wash, (iii) there are no loan documents, (iv) at the time of the advance no promissory note was prepared or signed, (v) the Check was made payable to Debtor, (vi) the Check was deposited into Debtor's bank account by Mr. Chung, (vii) after the sale of the restaurant Mr. Chung came to the car wash and demanded repayment, and (viii) Mr. Kim testified that he did say he would repay Mr. Chung regardless of whether the advance was an investment or a loan.

The documentary evidence shows: (i) the K-1s for 2017-2019 state that Mr. Kim is the 100% owner of Debtor, (ii) the March 3, 2017, email from Mr. Song to Mr. Chung requesting that Mr. Chung sign the OA states that it is for "bank purposes only and there will be another one to be signed by all partners for our own purpose." [Doc. 115, pp. 8-10], (iii) a draft promissory note was sent to Mr. Kim's email in December 2018 that made the note payable by Mr. and Mrs. Kim and was not executed, (iv) when discussing the transaction on the telephone Mr. Kim referred to Debtor as "our company" and stated that he needed to repay Mr. Chung from the sale of the

13

Debtor, (v) on March 13, 2017, Mr. Song emailed Mr. Chung and requested Mr. Chung sign a corporate resolution for Debtor, (vi) a corporate resolution authorizing Debtor to purchase property and obtain a bank loan was dated March 17, 2017.

The *Lane* factors do not weigh only on the side of debt or equity in this case. Certainly, the evidence of the advance, the OA, the lack of a fixed maturity date, the lack of payment enforcement rights and Debtor's failure to make any repayment or seek a postponement are generally indicative of an equity contribution. However, in this case, the Court does not find the OA to be the most important factor. In his testimony, Mr. Kim insisted that Mr. Chung was an investor and not a lender because Mr. Chung signed the OA. However, Mr. Kim first testified there was only one operating agreement, but when pressed on the discrepancies in the dates of the OA he admitted there was a prior agreement. He further stated he did not know about the date issue because Mr. Song and Mr. Chung prepared the documents and that Mr. Song and Mr. Chung understood them better than he did. Further, the OA is inaccurate as to the amount C1 advanced for its alleged interest. The OA reflects a $100 investment, not the correct amount of $100,000. Both Mr. Chung and Mr. Kim said the OA was for the closing to obtain over $3 million in financing and Mr. Song's email confirms this was the intention. In addition, and importantly, Debtor's tax returns corroborate this because Mr. Kim's K-1s for years 2017 through 2019 state that Mr. Kim was 100% owner of Debtor. Thus, the Court concludes that the OA does not accurately reflect the ownership of the Debtor at the time of the advance.

Intent is one of the remaining *Lane* factors and, in this case, the intent was for the funds advanced to be on loan rather than an investment. Mr. Chung testified that he intended the advance to be a loan. The Court does not rely on what may be a self-serving statement but looks at the "more reliable criteria of the circumstances surrounding the transaction." *Mixon*, 464 F.2d

14

at 407 (citations omitted). Mr. Chung's actions after he learned of the closing of the sale of the restaurant one month after the advance supports his stated intent. He said that he knew the restaurant had sold because he was at that time still working as the Kims' accountant, and when he was not paid, he went to the car wash to request payment. The undisputed facts corroborate Mr. Chung's belief that he was to be paid from the proceeds of the restaurant sale. Mr. Chung's lack of participation in management of the Debtor is also indicative of his intention that the advance be a loan, as was his belief that the loan was to be repaid from the sale proceeds and not from Debtor's profits. Mr. Chung's preparation of the promissory note, sending it to the Kims and suing to recover the loan are also indicative of a loan.

The June 2019 telephone conversation fails to shed light on what the parties intended at the time of the advance, as Mr. Kim stated that he needed to pay back Mr. Chung's money, but this is said in conjunction with statements by Mr. Kim about "our company" and the sale of the Debtor. Further, Mr. Kim testified he was going to pay Mr. Chung back regardless of the nature of the advance.

Overall, the Court is left with the distinct impression that the loan broker, Mr. Song, was orchestrating the purchase of the car wash by Debtor and that both Mr. Kim and Mr. Chung followed his directions. The Court concludes that Mr. Kim decided after closing that it would be better if C1 was an investor and then sought to convince Mr. Chung to become a member. The circumstances evidence Mr. Chung's intent and belief that the advance was a loan to be repaid by the sale of the restaurant. The promissory note supports Mr. Chung's understanding that the advance was a loan to Mr. and Mrs. Kim as did Mr. Chung's explanation of why he made the advance—he was trying to help two of his clients, Mr. Kim and Mr. Song.

After full and careful consideration of all of the evidence including the demeanor and credibility of the witnesses, the Court concludes that Mr. Chung intended to make a loan through his corporation, C1, to his good clients Mr. and Mrs. Kim, that Mr. Song orchestrated the documents to ensure the purchase of the car wash would close. The Court concludes that there was no agreement for Mr. Chung to become a member of Debtor. Based upon Debtor's tax returns and Mr. Kim's inconsistent testimony with respect to the OA and the inaccuracies in the OA, the Court concludes that Mr. Kim's testimony regarding Mr. Chung's advance of funds is not credible. For all of these reasons, the Court concludes that C1 made a loan to Mr. Kim and advanced those funds to Debtor. That being the case, the Court will sustain the objection because the Debtor was not the party to whom the loan was made and will disallow the Claim.

For the reasons stated herein, it is now

ORDERED that the claim of C1, LLC is disallowed in its entirety.

**END OF ORDER**

**Distribution List**

Robert P. Barclift
Barclift, Olubunmi and Kim, LLC
Suite 200
11340 Lakefield Drive
Johns Creek, GA 30097

Ingoo Kevin Kim
Barclift, Olubunmi and Kim, LLC
Suite 200
11340 Lakefield Drive
Johns Creek, GA 30097

Vanessa A. Leo
Office of the United States Trustee
362 Richard B. Russell Building
75 Ted Turner Drive SW
Atlanta, GA 30303

Michael D. Robl
Robl Law Group LLC
Suite 250
3754 LaVista Road
Tucker, GA 30084